UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| RICHARD W. FELKER, THOMAS W. FELKER, GINA L. BOGDAN and BROCK THUIS, individually and on behalf of others similarly situated,<br><br>                 Plaintiffs,<br><br>    v.<br><br>SOUTHWESTERN EMERGENCY MEDICAL SERVICE, INC.,<br><br>                 Defendant. | 2:05-cv-183-WGH-LJM |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, pursuant to consent of the parties and the Order of Reference entered by Chief Judge Larry J. McKinney on February 23, 2006.  A court trial was held in Terre Haute, Indiana, on August 15, 2007.  Plaintiffs were represented by counsel, Robert P. Kondras, Jr., and Jason M. Saunders.  Defendant was represented by counsel, Scott Craig and Tracy Lawson.

The parties submitted their proposed Findings of Fact and Conclusions of Law on October 1, 2007.  (Docket Nos. 35 and 37).

The Magistrate Judge, being duly advised, hereby enters his Findings of Fact, Conclusions of Law and Decision:

## Findings of Fact Related to
## Jurisdiction, Venue and the Parties

1. This matter was removed to this Court by Defendant, Southwestern Emergency Medical Service, Inc. ("SEMS"), from the Greene Superior Court, as one of Plaintiffs' theories raised a question of federal law. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, 29 U.S.C. § 201 *et seq.*, and supplemental jurisdiction over Plaintiffs' claims raised under Indiana law.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the alleged unlawful conduct herein was being committed in the Southern District of Indiana.

3. Plaintiff Richard W. Felker at all times relevant herein, was a resident of Greene County, Indiana, and was employed by SEMS from 2002 to 2005. At the end of his employment, he was an ALS-EMT. (See ¶ 10 below.)

4. Plaintiff Thomas W. Felker at all times relevant herein, was a resident of Greene County, Indiana, and was employed by SEMS from 2002 to 2005. At the end of his employment, he was a BLS-EMT.

5. Plaintiff Gina L. Bogdan is a resident of Sullivan County, Indiana, and was employed by SEMS for six months during 2003. At the end of her employment, she was a BLS-EMT.

6. Plaintiff Brock Thuis is a resident of Greene County, Indiana, and was employed by SEMS from 2002 to 2005. At the end of his employment, he was an ALS-EMT.

7. Defendant, SEMS, is an Indiana for-profit domestic corporation, with its principal offices located in Greene County, Indiana, at 902 E. Main Street, Jasonville, Indiana  47438.  The corporation is owned by Jeffrey Lecoq.

**Findings of Fact Relating to Count I,
the Fair Labor Standards Act ("FLSA") Claims**

8. The primary business of SEMS is to transport convalescent patients on a non-emergency basis from their homes, nursing homes, or other locations, to doctor and hospital visits when those patients' medical conditions do not allow for other modes of transportation.

9. Those who work as Emergency Medical Technicians ("EMTs") for SEMS are licensed by the State of Indiana as providers of emergency medical services.

10. There are several different levels of EMTs certified and recognized within the industry by the State of Indiana.  An EMT's level or certification depends on the individual's training and education.  The first or lowest recognized level of EMT is a "First Responder."  With additional education, certification and training an individual may be certified (from lowest to highest) as an:

    (a)    EMT -- Basic (or Basic Life Support – "BLS");

    (b)    EMT -- Basic Advanced (or Advanced Life Support – "ALS");

    (c)    EMT -- Intermediate; and

    (d)    Paramedic (the highest certified level).

11. The higher an EMT's certification or level, the more services and emergency care may be offered by the EMT. For example, an Intermediate EMT may administer medications intravenously and intubate a patient, care that lower level EMTs are not authorized to provide.

12. In addition to SEMS, Greene County is also served by Greene County Ambulance Service. Greene County Ambulance Service operates five full-time stations throughout the county.

13. SEMS is independent from, and not connected to, Greene County's emergency 911 system. SEMS uses its own dispatcher and does not receive dispatches through Greene County's emergency 911 system.

14. Because SEMS is not part of Greene County's emergency 911 system, emergency calls in the county are responded to by Greene County Ambulance Service. SEMS did and does provide back-up services for Greene County Ambulance Service. On occasions, SEMS would respond to auto accidents involving multiple injured parties (for instance, an accident on U.S. 41 involving a school bus). Those who worked for SEMS had to be prepared each day to respond to calls for emergency services.

15. During Thomas Felker's employment at SEMS, he recalled having responded to at least two accidents which occurred on highways (one accident on S.R. 59 and another on U.S. 41). Gina Bogdan recalled having responded to three automobile accidents on highways (one accident on S.R. 59, one on U.S. 41, and one on S.R. 54.) Brock Thuis only recalled having responded to one

accident on a highway (an accident that occurred on Interstate 70).  At least two of these responses were occasions when Plaintiffs were traveling on other SEMS business and either witnessed the accident or happened on an accident that had just occurred.

16.   During Plaintiffs' employment with SEMS, SEMS was staffed by both ALS and BLS level EMTs.  Generally, ALS level employees were compensated at a higher hourly rate than were BLS level employees, depending on an employee's seniority with the company.  SEMS generally paid ALS employees at a higher hourly rate than BLS-EMTs because SEMS was able to bill more to patients and insurance carriers for services rendered by the more highly certified EMTs.

17.   In 2004, Plaintiffs Brock Thuis, Richard Felker and Thomas Felker were all being compensated at the rate of $187.20 per 24-hour shift, or $7.80 per hour.

18.   Each of the Plaintiffs in this case worked 24-hour shifts with some degree of regularity, and on at least some occasions worked more than one 24-hour shift, requiring them to work greater than 40 hours in a work week.

19.   SEMS never paid any of the Plaintiffs other than at their straight time rates for hours worked over 40 during any given pay period.

20.   Jeffrey Lecoq, the principal owner of SEMS, also owned two other businesses – "J & D Used Car Sales" which sold automobiles and "Southwestern Fire & Safety" which sold fire trucks, firefighting equipment and ambulances.  Each business had its own employees, maintained its own financial accounts

and records separately, filed its own tax returns, and otherwise remained separate and distinct businesses owned by the same individual.  The evidence that some of the Plaintiffs may have assisted with one of the other businesses on a few occasions by helping to unload a truck or picking up supplies for another company or that SEMS and the other companies kept their supplies at the same place is insufficient to satisfy Plaintiffs' burden to prove that J & D Used Car Sales, Southwestern Fire & Safety and SEMS are "related activities."

21.  The Department of Labor's regulations define the term "annual gross volume of sales made or business done" as follows:

> gross receipts from all types of sales made and business done during a 12-month period.  The gross volume of sales made or business done means the gross dollar volume (not limited to income) derived from all sales and business transactions including, for example, gross receipts from service, credit, or other similar charges.  Credits for goods returned or exchanged and rebates and discounts, and the like, are not ordinarily included in the annual gross volume of sales or business.

29 C.F.R. § 779.259(a).

22.  The tax returns filed by SEMS for the relevant years in question are as follows:

| Year | Gross Receipts or Sales | Less Returns and Allowances | Balance |
| --- | --- | --- | --- |
| 2002 | $621,951 | $205,959 | $415,992 |
| 2003 | $650,310 | $239,382 | $410,928 |
| 2004 | $823,169 | $240,604 | $582,565 |
| 2005 | $683,454 | $147,182 | $536,272 |

23. Applying the definition found at 29 C.F.R. 779.259(a) (Finding of Fact 21) to the evidence in this case, SEMS did not do an "annual gross volume of sales made or business done" in excess of $500,000 in 2002 or 2003. SEMS did do an "annual gross volume of sales made or business done" in excess of $500,000 in 2004 and 2005.[1]

### Conclusions of Law as to the FLSA Claims

1. There are two ways in which SEMS could be liable for payment of overtime compensation to the Plaintiffs, either: (1) "individually" if the employee himself/herself is "engaged in commerce or in the production of goods for commerce"; or (2) through the employer if employed in an enterprise "engaged in commerce or in the production of goods" if that enterprise's "annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 206(a); 29 U.S.C. § 203(s)(1).

2. The Supreme Court has made clear that courts should interpret coverage under the FLSA liberally, "to apply to the furthest reaches consistent with congressional direction," while they should construe exemptions from

---

[1] SEMS' accountant, Ms. Keller-Duzan, testified that there were substantial adjustments made retroactively during the years 2004 and 2005, but did not quantify, in her testimony, the amount of the adjustments. The Defendant tendered Exhibit A as a summary of her testimony. However, the Magistrate sustained an objection to the entry into evidence of this document based upon FED.R.EVID. 1006 because the originals of the voluminous writings which made up the underlying data for the summary were not produced in open court nor made available prior to trial for inspection by Plaintiffs so that they could determine the accuracy of the purported summary. Without the summary, the Magistrate Judge is unable to do more than speculate as to the amount of returns which would be used to reduce the gross volume of sales. SEMS had not filed amended returns prior to trial, which might have been evidence material to this issue.

coverage very narrowly. *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 296 (1985); *Powell v. U.S. Cartridge Co.,* 339 U.S. 497, 516-17 (1950).

    3. Each of the four Plaintiffs, Richard Felker, Thomas Felker, Gina Bogdan and Brock Thuis, worked for SEMS as EMTs and ambulance drivers. As ambulance drivers, each of the Plaintiffs was engaged in interstate commerce because the Plaintiffs, as a daily part of their job duties for SEMS, had to be prepared to respond to emergency calls about accidents on highways and roadways. Federal law is clear that ambulance services which pick up victims of motor vehicle accidents on public highways and streets are engaged in interstate commerce. *Bayles v. American Medical Response of Colorado, Inc.,* 937 F.Supp. 1477, 1482-85 (D.Colo. 1996); *Smith v. F-M Ambulance Service, Inc.,* 914 F.Supp. 359, 361-62 (D.N.D. 1995); *Spires v. Ben Hill County,* 745 F.Supp. 690, 694-96 (M.D.Ga. 1990); *Conway v. Takoma Park Volunteer Fire Dept., Inc.,* 666 F.Supp. 786, 790-91 (D.Md. 1987); *Huber v. Aid Ambulance, Inc.,* 1977 WL 1783 (N.D.Ill. 1977); *Wirtz v. A-1 Ambulance Service, Inc.,* 299 F.Supp. 197, 201 (E.D.Ark. 1969); *Duffy v. Oele,* 274 F. Supp. 307 (W.D.Mich. 1967); *see also Zorich v. Long Beach Fire Dept. and Ambulance Service, Inc.,* 118 F.3d 682 (9th Cir. 1997); *Usery v. Holston's Ambulance Service, Inc.,* 1976 WL 1749 (W.D. La. November 9, 1976); *Benson v. Universal Ambulance Service, Inc.,* 675 F.2d 783 (6th Cir. 1982). This is true even of ambulance services (and individual ambulance drivers) making intrastate trips to pick up victims of automobile accidents on public highways

and streets. *Huber v. Aid Ambulance, Inc., supra.* In this case, the Magistrate Judge concludes that an EMT or ambulance driver who must be prepared on a daily basis to provide emergency services is engaging in interstate commerce even if the actual occasion to provide those services happens only once or twice a year.

    4. The Magistrate Judge hereby concludes and rules that each of the Plaintiffs, Richard Felker, Thomas Felker, Gina Bogdan and Brock Thuis, were eligible for overtime compensation for hours worked in any week over 40, as each Plaintiff was engaged in interstate commerce and therefore each was "individually" covered under FLSA. 29 U.S.C. § 206(a); 29 U.S.C. § 203(s)(1). The FLSA requires than an employee who works more than 40 hours in a workweek must be paid compensation at a rate of one and one-half times his regular pay for hours in excess of 40. 29 U.S.C. §207(a)(1).

    5. Additionally, should an appellate court conclude that Conclusions of Law 3 and 4 are incorrect and that the Plaintiffs have not established FLSA's protections under the "individual coverage" test, Plaintiffs have proven that SEMS was an "enterprise," thereby subjecting SEMS to liability to pay overtime but only for some periods of time.

    6. The three primary elements to be considered when analyzing what constitutes an "enterprise" are: (1) related activities, (2) performed through unified operations or common control, (3) for a common business purpose.

*Brennan v. Arnheim & Neely, Inc.,* 410 U.S. 512 (1973).  As discussed in 29 C.F.R. § 779.206(b):

> Generally, the answer to the question whether particular activities are "related" or not, will depend in each case upon whether the activities serve a business purpose common to all the activities of the enterprise, or whether they serve a separate and unrelated business purpose.  For example, where a company operates retail or service establishments, and also engages in a separate and unrelated construction business, the construction activities will not be "related" and will constitute a separate enterprise if they are conducted independently and apart from the retail operations.

7.  Plaintiffs have failed to demonstrate that the three businesses owned by Mr. Lecoq constituted "related activities" and therefore should not be considered in the aggregate in determining whether SEMS had over $500,000 in "annual gross volume of sales made or business done."  The fact that all three businesses were owned by Mr. Lecoq and were all located (at least in part) in Jasonville merely shows common ownership and proximity, not related activities.  Each company maintained separate and unrelated business purposes – SEMS was engaged in the provision of ambulance services; J&D Used Car Sales in the retail sale and repair of vehicles; and Southwestern Fire & Safety in the sale of fire trucks, firefighting equipment and ambulances.

8.  Because Mr. Lecoq's other businesses are not "related," the determination of SEMS' "gross volume of sales made or business done" must be restricted to its activities only and not those of any other entity.  SEMS did exceed $500,000 in "gross volume of . . . business done" during the years 2004 and 2005 only.

## Findings of Fact Relating to Count IV,
## the Breach of Contract Claims

24. Sometime during the first half of 2004,[2] Plaintiffs Brock Thuis, Richard Felker and Thomas Felker, and at least two other SEMS employees, Kelly Portteus and John Boucher, each signed a contract with SEMS titled "CONTRACT – INTERMEDIATE EMT." (Plaintiffs' Exhibit 1). At the time the contracts were signed, none of the aforementioned employees was certified as an Intermediate EMT.

25. The document marked as Plaintiffs' Exhibit 1 was drawn by Darren Sluder, a representative of SEMS, and was presented to each Plaintiff for his/her signature. There is no evidence before the Magistrate Judge that the parties attempted to negotiate the terms of this document.

26. The three Plaintiffs who signed Intermediate EMT Contracts (as well as Ms. Portteus and Mr. Boucher) began training to become certified as Intermediate EMTs by taking a class conducted in Bloomfield, Indiana. The cost of this class was $1,100 per student. This expense was paid on behalf of SEMS' employees by SEMS.

27. While taking the Intermediate EMT classes, the three Plaintiffs continued to work at SEMS and continued to be paid at a rate of less than $9.00 per hour.

---

[2]The original signed copies of these contracts have been lost and, therefore, the precise date the contracts were signed is unknown. It was, though, undisputed by the parties that each of the Plaintiffs (except Ms. Bogdan) signed a contract identical to the sample contract introduced into evidence as Plaintiffs' Exhibit 1.

28. All of the three Plaintiffs (Thuis, R. Felker and T. Felker) eventually dropped out of the Intermediate EMT classes and otherwise ceased training to become an Intermediate EMT. Two other SEMS employees (Ms. Portteus and Mr. Boucher) completed the classes in Bloomfield (in addition to other certification requirements) and became certified as Intermediate EMTs.

29. After dropping out of Intermediate EMT training, the three Plaintiffs continued to work at SEMS until their resignations before the end of 2005 and continued to receive pay at a rate of less than $9.00 per hour. Plaintiffs have not established that they worked for SEMS 18 months after they signed the contracts "in the first half of 2004."

30. SEMS sought reimbursement from Thomas Felker and Richard Felker for the $1,100 spent by SEMS for the Intermediate EMT classes in Bloomfield. Richard Felker has paid the company $400 in partial reimbursement for the training. Thomas Felker has not made any reimbursement.

31. The other two SEMS employees (Ms. Portteus and Mr. Boucher) who signed Intermediate EMT Contracts both ultimately completed their training and became certified as Intermediate EMTs. After becoming certified Intermediate EMTs, both Ms. Portteus and Mr. Boucher received an increase in pay to the rate of $9.00 per hour.

## Conclusions of Law as to the Breach of Contract Claims

9. Interpretation of the language in a contract is a question of law. *Art Country Squire, L.L.C. v. Inland Mortg. Corp.,* 745 N.E.2d 885, 889 (Ind.Ct.App.

2001).  The trial court's goal is to give effect to the intent of the parties as expressed within the four corners of the document.  *Id.*  We may not construe unambiguous language to give it anything other than its clear, obvious meaning, and we may not add provisions to a contract that were not placed there by the parties.  *Id.*  Rather, we determine the meaning of a contract from an examination of all of its provisions, without giving special emphasis to any word, phrase or paragraph.  *Id.*

    10.  A "contract term is not ambiguous merely because the parties disagree about the term's meaning."  *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp.,* 775 N.E.2d 1168, 1173 (Ind.Ct.App. 2002).  Rather, language is ambiguous only if reasonable people could come to different conclusions about its meaning.  *Id.*  Ambiguity in a contract may be one of two types:  patent or latent.  Patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning."  *Oxford Financial Group, Ltd. v. Evans,* 795 N.E.2d 1135, 1143 (Ind.Ct.App. 2003).  Latent ambiguity, on the other hand, "rises only upon attempting to implement the contract."  *Id.* at 1144.  Patent ambiguity presents a pure question of law, *id.* at 1143, while the fact finder resolves latent ambiguity as a question of fact, *id.* at 1144.  Accordingly, extrinsic evidence is admissible to explain the meaning of latent ambiguity, *id.*, but is not admissible to explain patent ambiguity, *id.* at 1143.

11.  Extrinsic evidence is "evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement."  *CWE Concrete Const., Inc. v. First Nat. Bank,* 814 N.E. 2d 720, 724 (Ind.Ct.App. 2004), *trans. denied* 831 N.E.2d 739 (Ind. 2005).

12.  There is a "patent" ambiguity in Plaintiffs' Exhibit 1 (meaning it is apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning.)  *Eckart v. Davis,* 631 N.E.2d 494, 497 (Ind.Ct.App. 1994).  Specifically, while the language of the contract states that "THE COMPANY SHALL PAY THE EMPLOYEE A MINIMUM OF $9.00 PER HOUR PER ON-CLOCK TIME," the contract does not state a beginning point for the new wage rate, nor does the language explicitly condition the new wage rate on completion of any particular class or training.

13.  "Extrinsic evidence is not admissible to explain or remove a patent ambiguity."  *Id.*  As such, resolution of this ambiguity presents a question of law.  *Boswell Grain and Elevator, Inc. v. Kentland Elevator and Supply, Inc.,* 593 N.E.2d 1224, 1227 (Ind.Ct.App. 1992).  In interpreting a contract, courts seek to ascertain the intent of the parties and will accept an interpretation of the contract that harmonizes its provisions as opposed to one which causes the terms to be conflicting.  *Id.* at 1226-27.  "An ambiguous contract will be construed against the party who drafted it."  *Id.*  SEMS was the drafter of the

Intermediate EMT Contract and any ambiguity in that contract will be construed against SEMS.

14.  The language of the Intermediate EMT Contract promises payment of a minimum of $9.00 per hour to the "*EMPLOYEE*," not to an Intermediate EMT. The language of the Intermediate EMT Contract makes it plain that the SEMS employee signing the contract has not yet become an Intermediate EMT.  The contract promises the "EMPLOYEE" a $9.00 per hour minimum, but makes clear that, as part of the contract, the employee will be required to enroll in and complete an Intermediate EMT training course.  The contract contains no language, express or implied, that the $9.00 per hour minimum pay will only begin when the employee completes training and becomes an Intermediate EMT. Finally, the language of the contract makes clear that each employee provided consideration to SEMS in exchange for the promise that SEMS would begin to pay at least $9.00 per hour.  Each employee who signed the contract had to promise to spend additional amounts of his/her time and effort participating in the Intermediate EMT training classes.  More importantly, each employee who accepted SEMS' offer had to promise to continue employment with SEMS for a period of at least 18 more months *after* accepting the contract, or be subject to a financial penalty in the form of repaying SEMS for the Intermediate EMT training course.  The only logical and harmonious interpretation of the contract would entail a reading whereby SEMS' employees were promised $9.00 or more per

hour in exchange for a promise to begin the process of becoming Intermediate EMTs, along with a promise of continued employment.

15.   The Magistrate Judge concludes that SEMS breached its Intermediate EMT Contracts with Richard Felker, Thomas Felker and Brock Thuis.  There was no dispute that SEMS did not begin paying Richard Felker, Thomas Felker and Brock Thuis at a rate of at least $9.00 per hour after each signed his contract.  There was no dispute that each Plaintiff did keep his end of the contract and began to take the Intermediate EMT course.  SEMS breached its Intermediate EMT Contracts with Richard Felker, Thomas Felker and Brock Thuis, respectively, when SEMS failed and refused to begin paying hourly wages to each at $9.00 per hour, as promised in the contract.  SEMS is liable for its breach of contract to each of these three Plaintiffs.

**Finding of Fact Relating to Count III, Claims for
Unpaid Wages Under the Indiana Wage Payment Act**

32.   Plaintiffs Richard Felker, Thomas Felker and Brock Thuis were paid at a lesser hourly rate after they signed the Intermediate EMT Contracts than the minimum pay of $9.00 per hour per on-clock time called for under the contracts.  The exact amount that each of these three Plaintiffs were underpaid will be determined at a hearing on damages.

## Conclusion of Law as to the Claims for Unpaid Wages Under the Indiana Wage Payment Act

16.  For all hours worked after their hourly rate of pay should have been a minimum of $9.00 per hour per on-clock time, each of these three Plaintiffs are owed the amount of the underpayment, and those unpaid wages are to be liquidated (trebled) under I.C. 22-2-5-2.

## Findings of Fact Relating to SEMS' Counterclaim Against Richard Felker and Thomas Felker

33.  Findings of Fact 24, 25, 26, 27, 28 and 30 also apply to the Counterclaim.

## Conclusions of Law as to SEMS' Counterclaim

17.  Conclusions of Law 9 through 11 also apply to the Counterclaim.

18.  Plaintiffs' Exhibit 1 is unambiguous as to this language:  "THE COMPANY SHALL PAY FOR THE INTERMEDIATE EMT LEVEL TRAINING FOR THE EMPLOYEE AS LONG AS THE EMPLOYEE AGREES TO AND COMPLETES AN 18 MONTH EMPLOYMENT WITH THE COMPANY.  THE EMPLOYEE SHALL BE REQUIRED TO REIMBURSE COMPANY FOR THE TRAINING EXPENSES INCURRED IF THE EMPLOYEE CANNOT COMPLETE THEIR 18 MONTH STAY DUE TO ANY CONDITION.  (TERMINATION, ANOTHER JOB ETC.)."

19.  Because Thomas Felker and Richard Felker have failed to prove that they completed an "18 month employment with the Company," the contract

unambiguously calls for them to reimburse SEMS for the costs of the EMT level training.

20. However, under Indiana law, "[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Licocci v. Cardinal Associates, Inc.,* 492 N.E.2d 48, 52 (Ind.Ct.App. 1986); *Lawrence v. Cain,* 245 N.E.2d 663 (Ind.App. 1969); *Records v. Smith,* 126 N.E. 335 (Ind.App. 1920). "As a rule, a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform . . . where a contract is not performed the party is guilty of the first breach is generally the one upon whom rests all the liability for the nonperformance . . . . A party who has himself been guilty of the first substantial breach of contract cannot rescind the contract because of the subsequent refusal or failure by the other party to perform." *Lawrence,* 245 N.E.2d at 669 (quoting 17 Am. Jur. 2d, Contracts § 365 (1964)).[3]

21. "A party who fails to make payments as required by a contract is guilty of a breach thereof." *Licocci,* 492 N.E.2d at 52, citing *Brown v. Markland,* 53 N.E. 295 (Ind.App. 1899).

22. In this case, there was no dispute that SEMS failed to pay Richard Felker, Thomas Felker and Brock Thuis at least the promised $9.00 per hour

---

[3]A substantial portion of 17 Am. Jur. 2d, Contracts § 365 (1964), now appears at 17A Am. Jur. 2d Contracts § 606.

after each gentleman signed the Intermediate EMT Contract.  SEMS breached that contract first by failing to make the payments required by the contract at the rate promised.  It has still not cured that failure.  SEMS has only sued Richard Felker and Thomas Felker for repayment of training fees paid, but SEMS breached the contract first.  Under Indiana law, SEMS is precluded from seeking enforcement of the contract because it is guilty of the first breach.  Its Counterclaim against Richard Felker and Thomas Felker must, therefore, be dismissed.

## Decision

I conclude that all four of the Plaintiffs "engaged in commerce" when they performed their duties for SEMS because I am required to liberally construe coverage under the FLSA, and I conclude that they were required on a daily basis to be prepared to respond to emergencies, and on at least some occasions did respond to emergencies on interstate highways.  They are entitled to be paid overtime for those hours they can prove that they worked in excess of 40 hours each week.

I further find that the Plaintiffs who signed the Intermediate EMT Contract attached to the Complaint are entitled to be paid $9.00 per hour from the date of the signing of the contract.  This is because the contractual document drawn by SEMS contains a patent ambiguity.  Where there is a patent ambiguity, I may not use extrinsic evidence to supply the meaning of the terms, but must instead apply a reasonable construction favorable to the party who did not draft the

document.  Here, it is reasonable to believe that payment of wages of $9.00 per hour would be paid so long as the Plaintiffs began performance of their obligation to train for Intermediate EMT status.

Thomas Felker and Richard Felker did not remain employed with SEMS for 18 months, and the Intermediate EMT Contract calls for them to repay SEMS for training costs advanced.  However, under Indiana law, because SEMS first breached the contract at issue, they may not bring a cause of action for a second or later breach.

A **HEARING** to determine the amount of damages the Plaintiffs are entitled to receive is hereby set for **THURSDAY, DECEMBER 6, 2007**, at 10:00 a.m., Terre Haute time (EST), before the Magistrate Judge in Room 215 of the Federal Building in Terre Haute, Indiana.

**SO ORDERED.**

**Entered:**  October 31, 2007

                                                 WILLIAM G. HUSSMANN, JR.
                                                     Magistrate Judge

**Electronic copies to:**

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

Scott  Craig
COX ZWERNER GAMBILL & SULLIVAN
scraig@coxlaw.net

Jason M. Saunders
jasonmsaunders@verizon.net